KELL v. TRENCHARD et al.

(Circuit Court of Appeals, Fourth Circuit. November 9, 1905.)

No. 545.

1. FRAUD—FALSE REPRESENTATIONS ON SALE—DAMAGES.

The measure of damages recoverable in an action for fraud and deceit, based upon a sale induced by false representations made by the seller, is the difference between the actual value of what the purchaser parted with and the actual value of what he received. The damages may also include outlays legitimately attributable to the fraud.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, §§ 60–62.]

2. VENDOR AND PURCHASER—FALSE REPRESENTATIONS BY AGENT—LIABILITY OF PRINCIPAL—ABATEMENT OF PRICE.

Plaintiffs purchased from defendant for a lump sum certain property, consisting of a sawmill, railroad, and land with standing timber, stated in the option given and upon which the sale was made to be not less than 35,000,000 feet. Plaintiffs sent a representative to examine and estimate the timber, who was referred by defendant to his agent, and such agent, by false representations as to the boundaries, knowingly deceived the representative as to the quantity of timber. His estimate was less than 35,000,000 feet, however, and before the sale was closed plaintiffs were put upon notice that there was probably less even than such estimate. There was in fact but about 8,500,000 feet. Held, that defendant was responsible for the false representations of his agent by which the examination made by plaintiffs was rendered unavailing, and that, while the statement in the option was not intended nor relied upon as a warranty, plaintiffs were entitled to an abatement of the purchase price to the extent of the difference between the value of the timber at the lowest estimate of quantity received by plaintiffs and the value of that actually received.

3. SAME—FRAUDULENT REPRESENTATIONS—GROUND FOR RESCISSION—EFFECT OF.

Fraud, deception, or misrepresentation in information given by a vendor to a vendee respecting a material fact, and in the belief and upon faith of which vendee acted, is ground for rescission of contract by court of equity. In such case there can be no such thing as equality of information, which is apparently open to each side, and it is immaterial that the party making the representation may have been ignorant as to whether it was true or false; the real inquiry being, not whether the vendor knew the representation to be false, but whether the vendee believed it to be true and was misled by it in entering into the contract.

4. SAME—CAVEAT EMPTOR—DOCTRINE OF.

The doctrine of caveat emptor has no application to cases of actual fraud in representations made by a vendor to a vendee respecting material facts, and in the belief of and upon the faith of which the vendee acts.

5. FRAUD—SALE OF LAND—MEASURE OF DAMAGES—AMOUNT PAID FOR OPTION.

The amount paid by plaintiffs to the holder of an option to purchase certain property *held*, under the peculiar circumstances shown by the evidence, not recoverable from the vendor because of false representations made by him in respect to the property.

Appeal from the Circuit Court of the United States for the Eastern District of North Carolina, at Raleigh.

For opinion below, see 127 Fed. 596.

This is an appeal by the defendant and cross-complainant from a decree of the Circuit Court of the United States for the Eastern District of North Carolina entered in a suit for alleged fraud and misrepresentation in the sale of certain timber lands, etc., in Northampton county, N. C., in which there was a cross-bill for the enforcement of the payment of certain notes given for unpaid purchase money. On the 4th of April, 1901, the appellant, F. Kell, who resided at Gumberry, Northampton county, N. C., gave to B. E. Oberndorfer, of Norfolk, Va., an option for 90 days upon certain of said Kell's property, fully described in said option, consisting briefly of lands, lumber plant, saw and planing mill, horses, stock of goods, buildings, etc., used in connection therewith, including a railroad, rolling stock, etc., known as the "Northampton & Hertford Railroad Company," chiefly used in said lumber business. Also certain standing timber described in said option as follows: "Also all the standing timber in Northampton county, N. C., owned by said F. Kell, which consists of not less than 35,000,000 feet." The said Oberndorfer was to pay $60,000 for the property; $40,000 in cash, and the remaining $20,000 in one and two years, with interest from date, to be secured by a lien on the property. This option was extended just before its expiration for the period of 30 days, and the terms so modified as to provide for the payment of $20,000 cash, and the remaining $40,000 in one year, to be secured by a lien on said property, with interest from date. Early in June, 1901, W. E. Trenchard and C. T. Wescott, two of the appellees, who had previously been engaged in the veneering business in Maryland, sold out their plant, and came south to look for a "timber proposition" of some kind. While in Norfolk they met a Mr. Powell, who informed them of the existence of the Oberndorfer option, and of the Kell property, and they determined to to go to Gumberry with a view of examining the property, which they did, and on their arrival at the depot met Mr. Kell with his representative, W. H. Vaughan, whom, he informed them, would show them the timber, as he was familiar with it. They were driven by Mr. Vaughan over the land, or what they supposed to be the land. They spent a couple of days examining the property, covering a circuit of about 20 miles; the said Vaughan representing that appellant Kell owned the lands around which they circled, and in addition, that he owned timber on the outside of the boundaries pointed out. The timber on Kell's land so pointed out, he estimated at 40,000,000 feet. Knowing that the Oberndorfer option had but a short time to run, negotiations were opened with Kell direct, looking to the purchase of the property in question;

142 F.—2

but he would not treat with them, and they then commenced negotiations with Oberndorfer, whose option had been extended. Thereupon they employed one J. C. Pringle, a timber expert, who, with a letter from Oberndorfer to Kell, went to Gumberry; said Kell having informed Oberndorfer that his timber man, W. H. Vaughan, would show his timber to whoever he might send to inspect it. Upon Pringle's arrival at Gumberry he was met by Mr. Kell's bookkeeper, who introduced him to said Vaughan, to show him the timber; the latter saying that he represented Mr. Kell as foreman or superintendent of his timber property. Vaughan thereupon took Pringle in charge, went with him to Jackson, and from there took him into the woods, and showed him certain timber lands which he represented belonged to Kell. The first day they took the trip through the woods on horseback; the second day he took him around a body of land containing about 7,000 acres, which was in between two county roads, and informed Mr. Pringle that all the timber within those roads belonged to Kell; and he also pointed out numerous other tracts outside of these boundaries or roads, the timber upon which he said also belonged to Kell. Pringle estimated that the timber on the land pointed out to him as the property of Kell, contained about 32,000,000 feet, and so reported to Wescott & Trenchard. Upon receiving Pringle's report, and having in view the statement of the option and the statements of Kell and Pringle in reference to the quantity of the timber, they concluded to purchase the option, and on the 31st day of July, 1901, met in the office of L. D. Starke, in the city of Norfolk, the latter, along with R. W. Shultice, being interested in the option with Oberndorfer, and the option was transferred to them in consideration of $8,500. Arrangements were then made for the attorneys of Wescott & Trenchard to examine the titles to the various properties, which, having been duly made, on August 13, 1901, Wescott & Trenchard and their attorneys proceeded to Gumberry, where they met Kell and his attorneys, and the sale was consummated. Separate deeds for the railroad, the timber and the plant, and the real estate and personal property at Gumberry were for convenience made to O. H. Guion, trustee, and two deeds of trust were executed by Guion to Peebles, trustee, one on the railroad, and the other on the other property, to secure two notes of $20,000 each, payable one year from date, with interest, appellees having made the cash payment of $20,000, and said Guion, trustee, afterwards conveyed the property of the Northampton & Hertford Railroad, and the other property to the Wescott & Trenchard Lumber Company, and the said Wescott & Trenchard, the owners of the entire property, thereupon took immediate possession, and continued under the name of the Northampton & Hertford Railroad Company and the Wescott & Trenchard Lumber Company to operate said railroad and plant until October, 1902, when they were placed in the hands of a receiver of this court. That said Wescott & Trenchard shortly after taking possession as aforesaid, placed upon the property valuable improvements, costing, as they claim, $7,500. That after improving the same, early in the year 1902, in the month of February or March, they began to suspect a serious shortage in the timber sold to them, and at once caused to be made a thorough and complete examination of the whole property, and again secured the services of Mr. Pringle, who came to Northampton county, and upon making an accurate and careful estimate of each tract of land, and a statement of the amount of the standing timber, he found that while there was 32,417,571 feet of standing timber on the land pointed out by Vaughan as belonging to Kell, that on the lands of said Kell, including what then remained and what had been cut, there was only 8,232,100 feet of timber, and that the entire residue was on land not owned by Kell; 11,635,200 feet being within one of the boundaries designated by said Vaughan as that of Kell, and 12,-550,400 feet within another territory that likewise belonged to some other person. That said appellees, being thus convinced that fraud had been practiced upon them, instituted this litigation by filing their complaint under the Code of Procedure of North Carolina, in the superior court of Northampton county, setting up the alleged fraud and deceit in the representation of the quantity of the standing timber owned by appellant Kell, and averring that they had been damaged to the extent of $48,000, and asked that they be awarded damages for this amount, and that their notes, amounting to $40,000, given for the

deferred payments, be surrendered to them, and they awarded judgment against Kell for $8,000. To this complaint the appellant Kell appeared, and asked that this cause be removed to the Circuit Court of the United States for the Eastern District of North Carolina, which being done he thereupon made answer, denying generally the allegations and averments of the complainant, particularly that he or his agent, Vaughan, had been guilty of any fraud or deception in connection with the transaction, and demanded judgment against Wescott & Trenchard for the principal sum of $40,000, due on the deferred payments for the property, with interest, and in his cross-complaint set up his lien securing the same, and asked that it be recognized and enforced by the court. The cause was thereupon referred to an examiner to take evidence, who duly took and returned the same, and the court thereupon heard the case upon the evidence thus taken, without a report from a master on the questions of law and fact involved in the case, and after full argument of counsel rendered the decree appealed from, in which the court held that the sale of the timber entered into between the parties was fraudulent in its inception, in that the same was induced by the fraudulent conduct of the appellant Kell and his agent, Vaughan; that the appellant had given a warranty that there should be at least 35,000,000 feet of standing timber, when in point of fact there was only cut therefrom 8,500,000 feet, valued at $1.50 per thousand feet; and that said contract should be reformed, and an equitable adjustment had between the parties upon the following basis: "Applying the rule adopted, complainants will be charged as follows: Railroad, $12,500; mill, land, etc., $15,000; timber, 8,500,000 feet, at $1.50 per thousand, $12,750; interest on $11,750, balance on amount found due in lieu of rent, $705; total $40,955; and also credited with the following amounts; cash paid on purchase, $20,000; amount paid for option, $8,500; total $28,500, leaving a balance of $12,455. The outstanding notes given for the purchase money will be abated, credited, and reduced accordingly." And the court allowed appellees 60 days in which to pay the balance of $12,455 found to be due by them, and in case of default appointed a commissioner to make sale of the property for the said amount, with costs; and also to pay appellees $7,500, the amount of improvements shown by the court to have been placed upon the property by the appellees." Trenchard v. Kell (C. C.) 127 Fed. 596, 603.

H. H. Little and F. H. Busbee, for appellant.

Calvert G. Peebles and James E. Shepherd (W. H. Day, on the brief), for appellees.

Before GOFF and PRITCHARD, Circuit Judges, and WADDILL, District Judge.

WADDILL, District Judge, after stating the facts as above, delivered the opinion of the court:

1. The court will, at the threshold, consider the extent of the relief to which the appellees are entitled in this case, and the propriety of going into the value of the property sold by the appellant to them, other than the timber, covered by the option; that is to say, assuming the appellees to be entitled to the relief asked, or some relief, by reason of the disparity in the quantity of the timber received from what they bought, whether the appellant will be allowed to set up against such loss the fact that the property, other than the timber, was of sufficient value to cover the amount agreed to be paid by the appellees for the whole. The lower court, after decreeing in favor of the appellees on the disparity in the quantity of the timber sold, took up the question of value of the other parcels of property included in the sale, and undertook to adjust the equities between them, fixing the values of the several classes of the property sold; and its action,

both in arriving at the amount of credit to be given the appellees by reason of the deficiency in the lumber, as well as the value placed upon the sawmill·plant and railroad, is the subject of several of the ·exceptions and assignments of error made by the appellant. The ·conclusion we have reached is that this basis of the adjustment of the equities between the parties, in so far as it undertook to arrive :at the values of the different parcels of property in detail, was errone-·ous; and that the proper method of settlement should have been to have credited the appellant by, and charged the appellees with, the full amount paid for the property, to wit, $60,000, and then credit appellees by the amount paid in cash by them, and such other sums ·as the pleadings and proofs in the case show them to be entitled to. The measure of damages in actions of fraud and deceit, based upon ·contracts induced by the false representations of one of the parties, is now well settled in the courts of this country, federal and state; the rule being that the recovery should be the difference between the .actual value of what the party defrauded parted with and the actual value of what he received under the contract. In other words, the re-·covery is limited to the actual loss sustained, and excludes all specu-lative profits. And, moreover, liability may be had for other outlays legitimately attributable to such party's fraudulent conduct. Smith v. Bolles, 132 U. S. 125, 129, 10 Sup. Ct. 39, 33 L. Ed. 279; Sigafus v. Porter, 179 U. S. 116, 122, 123, 21 Sup. Ct. 34, 45 L. Ed. 113, and ·cases cited.

The agreement to pay $60,000 was a single and entire undertaking for the whole property purchased; and appellant should not now be heard to say that, although there may have been fraud as charged by the appellees in the sale of the timber, the entire property was worth more than he sold the same for. This action involves solely the question of whether the appellees, by reason of the fraud practiced by the appellant and his agent, are entitled to relief because of the disparity in the quantity of the timber sold. They make no complaint as to the other property; but aver that as to the timber ·purchased there was a warranty that there would be at least 35,000,000 feet, and that the purchase of the timber was the moving consideration that caused them to acquire the property of the appellant, it being their purpose to go extensively into the lumber business; that the appellant and his agent, Vaughan, procured the contract from them by false representation as to the quantity of timber bought; and that they in consequence received 8,232,100 feet, instead of 35,000,000 feet purchased by them.

2. The credit, if any, the appellees should receive on account of the ·discrepancy in the quantity of the timber will depend, first, upon whether there was such fraud as entitled them to the relief sought, and the extent of the damage sustained by them. Appellees insist that appellant's option in this case constituted a warranty that there should be produced not less than 35,000,000 feet of timber under the contract; and there is great force in their contention. The language of the option is:

"Also all standing timber in Northampton county, N. C., owned by said F. Kell, which consists of not less than 35,000,000 feet."

This language, unexplained, would undoubtedly constitute a warranty. It is not a mere opinion or commendation of the timber sold. It is a distinct and unequivocal affirmation of a fact which was the basis of the transaction then under consideration. The wording, "which consists of not less than 35,000,000 feet" is very significant, particularly in an option given by the vendor as to the quantity of what he was selling, and, if accepted and acted upon by the parties, ought to be conclusive against the user of the language. "Any direct and positive affirmation of a matter of fact, as distinguished from a mere matter of opinion or judgment, made by the seller during the treaty of sale, and as a part of the contract, designed by him to induce the action of the purchaser, and actually, to some extent at least, relied upon by the latter in making the purchase, will be deemed to be a warranty." Mechem on Sales, § 1235 et seq.

The appellant earnestly insists that in entering into the transaction under consideration he disavowed the purpose of giving a warranty, and, moreover, that in any event appellees did not rely upon the warranty, and hence waived their right to take advantage of the same; and there is much evidence in this case to sustain this view of appellant, certainly enough to show that he did not mean, and appellees did not expect, that he would actually make good to them 35,000,000 feet of timber in any event. But, while this is true, it is equally clear that the appellees supposed they were buying timber approximating the quantity set forth in the option, and that they would not have thought of entering into the contract to purchase this lumber plant, and the railroad property used in connection therewith, had they not supposed this condition to exist, and the appellant led them to so believe, and it would be grossly inequitable to hold them bound by their contract, and afford them no relief, where there is such a discrepancy between what they believed they were buying and what they actually received. The appellant, however, insists that the rule of caveat emptor applies, that full opportunity was afforded appellees to ascertain the quantity of the timber upon the premises, and that they availed themselves of such opportunity and acted upon the information thus received, and not upon the representations of appellant, either personally given, or contained in the option, and they should be bound thereby. Suffice to say the doctrine of caveat emptor does not apply in cases of actual fraud. 1 Bigelow on Fraud, 528; Hill v. Brower, 76 N. C. 125; Barnard v. Kellogg, 10 Wall. 383, 388, 19 L. Ed. 987; Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 112, 3 Sup. Ct. 537, 28 L. Ed. 86. In this case, aside from the gross disparity between what was sold and what was delivered, which would of itself be sufficient to raise a presumption of fraud and entitle the appellees to relief in equity (Eaton's Eq. § 129½; Bispham, Eq. 129; Kerr on Fraud and Mistake, 187), there actually was fraud by and on the part of the representative of the appellant in deceiving the appellees as to the timber sold. In every instance in which appellees or their expert sought to procure information as to the quantity of timber purchased they were placed under the chaperonage of the appellant's foreman and superintendent of his timber lands, a per-

son found by the lower court, and in which finding we fully concur, to be of bad reputation, who purposely misled and deceived them as to what they were buying, and appellant cannot, and should not, escape the consequences of this conduct of his agent, assuming that he, the principal, was innocent, though it is clearly established that the appellant well knew that he had no such quantity of timber upon his tract of land as he pretended to sell; an offer of $60,000 for the same property having only a short time previously been rejected by lumbermen of experience in the community, because they knew no such quantity of timber was upon the property, and this fact was communicated to him. Andrus v. St. Louis Smelting & Refining Co., 130 U. S. 643, 648, 9 Sup. Ct. 645, 32 L. Ed. 1054; 14 Amer. & Eng. Ency. Law (2d Ed.) 22, 23; Story, Eq. Juris. § 187.

The liability of the principal for the acts of his agent, in cases like the present, is well recognized. In 1 Jaggard on Torts, 270, discussing the subject, it is said:

"So, if the agent points out the wrong land, and the purchase is made in the belief that the land shown is the land purchased."

McKinnon v. Vollmar, 75 Wis. 82, 43 N. W. 800, 6 L. R. A. 121, 17 Am. St. Rep. 178, is a decision to the same effect. "If false and fraudulent representations are made by an agent, the principal, although he be innocent of the fraud, cannot derive any benefit from the transaction founded on such misrepresentation." Bispham, Eq. § 17. "The false and fraudulent representations of an agent, when acting within the scope of his authority, bind the principal. A man cannot take any benefit under false and fraudulent representations made by his agent, although he may have been no party to the representations, and may not have distinctly authorized them." Kerr on Fraud and Mistake, 111. This point is distinctly decided in Pettijohn v. Williams, 46 N. C. 148, where the principle and authorities are forcibly discussed by Pearson, J., who says:

"So, if you advertise a tract of land, and refer persons who may wish to buy A. B., who is well acquainted with the land, and will go upon it with them, and show the boundaries, etc., does it need authority of decided cases to show that he is your agent, and that if he makes a willful misrepresentation, and points out land as belonging to the tract, which, in fact, it does not include, and thereby enables you to sell at an extravagant price, that you can, after notice of the fraud, which he practiced, insist upon keeping the whole price, and take the benefit of his falsehood, without being guilty of a fraud, as well in law as in morals? Can a man lawfully do that by another which he cannot do by himself? Just as soon as you showed a disposition to hold onto your illgotten gains every honest man would exclaim: 'You are just as guilty of a fraud as the vile instrument you made use of.' "

In Hoover v. Wise, 91 U. S. 311, 23 L. Ed. 392, it is said:

"But he [the principal] is liable in a civil suit if the fraud be committed in the transaction of the very business in which the agent was appointed to act."

And again:

"It is as much against conscience to attempt to avail one's self of the iniquity of an agent, after it is known, as if there had been deceit." Meadows v. Smith, 42 N. C. 7.

Also:

"No one can, in equity, be permitted to set up a benefit derived through the fraud of another, although he may not have had a personal agency in the imposition." Goode v. Hawkins, 17 N. C. 393.

In this case the knowingly false representations made by the appellant's agent as to the boundaries and area of the land, on which it is claimed the appellant owned the timber, clearly misled the appellees, and were false representations of a material fact, and in the belief and upon the faith of which the appellees acted, to their damage in making the purchase of the timber, and without which it would not have been made. In what has been said the court has not lost sight of the appellant's contention that the appellees failed to avail themselves of information readily at their hand, which would have enabled them to ascertain the quantity of timber upon the land, or to recognize the weight of authority cited in support of their contention, namely, Slaughter v. Gerson, 13 Wall. 375, 20 L. Ed. 627; Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678; Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931; Shappirio v. Goldberg, 192 U. S. 232, 242, 24 Sup. Ct. 259, 48 L. Ed. 419; Brown v. Smith (C. C.) 109 Fed. 26. The doctrine contended for in these cases as to the circumstances in which a party to the contract should have the right of rescission is clear; but is based upon the further principle that there must be no fraud, deception, or misrepresentation in the information given. In such case there can be no such thing as equality of information which is apparently open to each side. The law is well settled that a false representation by a vendor of a material fact constituting an inducement to the contract of purchase, and on which the purchaser had the right to rely, is a ground for the rescission of his contract by a court of equity, and that, too, though the party making the representation may have been ignorant as to whether it was true or false; the real inquiry being not whether the vendor knew the representation to be false, but whether the vendee believed it to be true, and was misled by it in entering into the contract. McFerran v. Taylor, 3 Cranch, 269, 2 L. Ed. 436; Rose's Notes, vol. 1, p. 238, and cases cited; Smith v. Richards, 13 Pet. 26, 10 L. Ed. 42; Grim v. Byrd, 32 Grat. (Va.) 300; McMullin's Adm'r v. Saunders, 79 Va. 365; Wren v. Moncure, 95 Va. 369, 28 S. E. 588.

3. The question of the abatement to be made on the balance of the purchase money due by the appellees on account of their purchase is one not entirely free from difficulty in this case, because of the trouble in determining just how much timber the appellant should be required in good faith to furnish under the circumstances of this case. The quantity received is not in serious dispute—that is, 8,500,000 of feet, as found by the lower court—and we concur in the view of that court that $1.50 per thousand is the proper value for the same. The appellant should not be required to make good the 35,000,000 feet; and, although he and his agent held out to the appellees that there was that quantity of timber, it is manifest that the appellees knew there was considerably less than that. Their own representative reported about 32,000,000 feet, and appellant's representative at a later period placed

them on reasonable notice that there might be only 28,000,000 feet; and while we believe that in good faith appellees believed they were to secure approximately 32,000,000 feet, and were so misled and deceived by appellant's representative, still we think under the pleadings in this case, which will be presently referred to, they should be given only credit for the smallest quantity that they had any reason to believe was upon the property, and there is evidence to show that after they bought the option from Oberndorfer for $8,500, before they actually closed the transaction with appellant, in going over the title deeds to the different parcels of property, when they were about to conclude the transaction by the passage of the title papers, that this same representative of the appellant, who had misled them as to the timber and boundaries, when brought to figure down as to the quantity of timber on each parcel of land with deeds in hand only estimated some 22,500,-000 feet, instead of what he had previously represented, thus putting the appellees on their guard at least to that extent, and the appellant should not now be held liable to them in this litigation, in adjusting the equities, for a greater quantity of timber than the 22,500,000 feet. This is particularly true because of the nature of this suit. It is peculiar in character, but is authorized by the code procedure of North Carolina, where distinctions between law and equity are abolished (Harris v. Tyson, 24 Pa. 347, 64 Am. Dec. 661), and its purpose is to secure an abatement on the notes given for the purchase price of the property as distinguished from a rescission of the contract for fraud between the parties. Appellees do not offer to return the property back to the appellant, and seek for a rescission of the contract between them, they to have refunded to them what they had paid; but, on the contrary, propose to keep what they received under the contract, and secure a credit for as much as possible arising from the fraud practiced upon them, and under such circumstances doubts should be solved against them in arriving at the quantum of the abatement. We think a fair adjustment of the equities between the parties would be to give to the appellees a credit on their purchase-money notes of the difference between 22,500,000 feet, being the least quantity of timber they should have received, and 8,500,000 feet they did receive, at the price of $1.50 per thousand feet, namely, 14,000,000 feet at $1.50 per thousand, $21,000; and that appellant should be given a decree accordingly for $19,000, the remainder of the purchase money, with interest from the day of sale, and that a day should be given appellees within which to pay the same, and in default thereof the property should be sold under the direction of the court to meet the amount due, according to the terms of the deed of trust.

4. The learned judge of the court below was of opinion that the cost of the option in this case, paid by the appellees to Oberndorfer, should fall upon the appellant because of the fraud practiced as to the quantity of the timber sold. In this view we do not concur. The contention seems to have been an afterthought on the part of the appellees themselves, as they made no such claim in their original complaint filed herein. They chose to buy the option from Oberndorfer and others, and we think they cannot secure an abatement of the pur-

chase money due appellant on account thereof. The effect of what they did was to give $68,500 for the property, instead of $60,000, the price which others better posted on its value than themselves had refused to give. In other words, they allowed themselves to be speculated upon in the purchase of the option, in order to acquire the property; and while doubtless sometimes the rule invoked by the chancellor is a proper one, and ought to be adhered to (Sigafus v. Porter, 179 U. S. 116, 123, 21 Sup. Ct. 34, 45 L. Ed. 113), we do not think that it should be in this case, under its peculiar facts and circumstances.

5. The improvements made by the appellees upon the property of $7,500, referred to in the decision of the lower court, becomes unimportant in the view we take of this case, since the appellees get the benefit of the improvements upon their own property; and, of course, if they do not pay the balance due on the purchase money, they should not be allowed any sum on account of improvements as against the unpaid purchase money.

6. The other assignments of error not specifically covered by what has been said, including those affecting the admission of evidence in the cause, and laches in the institution of the suit by the appellees, have been duly considered, and are believed to be without merit.

7. The costs in this cause in both courts should be borne equally between the appellant and the appellees.

The decree of the lower court will be modified, and this cause remanded to that court, to be proceeded with in accordance with the views herein expressed.