THURSTON et al. v. REED et al.

(District Court, D. Massachusetts. December 31, 1915.)

No. 615.

1. PATENTS ⬤⟹200—ASSIGNMENTS—CANCELLATION—SUFFICIENCY OF EVIDENCE.

In a suit to cancel the assignment of a patent having about 5½ years to run, evidence as to whether the assignee's agent represented to the patentee that it had only a short time to run *held* insufficient to show that the patentee was actually deceived regarding the unexpired term of his own patent, to the extent of believing that only a year or two of such term remained.

[Ed. Note.—For other cases, see Patents, Dec. Dig. ⬤⟹200.]

2. PATENTS ⬤⟹200—ASSIGNMENTS—CANCELLATION—MATERIALITY OF MISREPRESENTATIONS.

A statement by defendant's agent, in negotiating for the assignment of a patent having 5½ years to run, that it had only a short time to run, was not a material representation, authorizing a cancellation of the assignment for fraud.

[Ed. Note.—For other cases, see Patents, Dec. Dig. ⬤⟹200.]

3. PATENTS ⬤⟹200 — ASSIGNMENTS — CANCELLATION — SUFFICIENCY OF EVIDENCE.

In a suit to cancel the assignment of a patent, which the patentee had previously agreed to assign to a corporation of which F. was treasurer, and which was being wound up by its directors, as trustees for creditors and stockholders, evidence *held* to show that, while defendant's agent, in negotiating for the assignment, used the name of F., or referred to him in some way, such as conveyed to the patentee the impression that he came from F., he did not represent that he was sent by F. to see the patentee respecting the patent.

[Ed. Note.—For other cases, see Patents, Dec. Dig. ⬤⟹200.]

4. PATENTS ⬤⟹200—ASSIGNMENTS—CANCELLATION—MISREPRESENTATIONS.

Plaintiff assigned certain patents covering processes for coating one metal with another to a corporation, agreeing to also assign patents subsequently obtained. He afterwards obtained a patent covering such processes, but for more than 11 years it had been left in disuse, and the corporation had requested no assignment. The corporation had discontinued business and was being wound up by its directors. The agreement to assign had not been recorded in the Patent Office. Defendant's agent, in negotiating with the patentee for an assignment of the patent, stated to the patentee, according to the patentee's claim, that the corporation had no claim on such patent; that he had been at Washington and examined the record, and there was no assignment on record; that the patent would revert to the patentee if the company had lapsed; and that the patentee had authority to assign it, and nothing could be done about it, if he did assign it. *Held*, that there was in this no false representation of a material fact, authorizing a cancellation of the assignment, since the statement that no assignment appeared of record was true, as was also the statement that the patent was the patentee's property, and he was free to sell and assign it, so far as the record showed, while the statement as to the patentee's rights, if the company had lapsed, was no more than a statement of opinion as to a matter of law.

[Ed. Note.—For other cases, see Patents, Dec. Dig. ⬤⟹200.]

5. PATENTS ⬤⟹200—RESCISSION FOR FRAUD—DEGREE OF PROOF REQUIRED.

To establish actual fraud, warranting the cancellation of a contract, clear, unequivocal, and convincing proof, going beyond a mere preponderance in plaintiff's favor, is necessary.

[Ed. Note.—For other cases, see Patents, Dec. Dig. ⬤⟹200.]

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. PATENTS ⬤⇒200—ASSIGNMENTS—CANCELLATION—GROUNDS.

Plaintiff owned a patent, which he had agreed to assign to a corporation, and, at the time an assignment was made to defendant, who had no notice of the agreement to assign, plaintiff was 79 years old and had a poor memory, but was not incapable of managing his own affairs. Defendant's agent exercised no undue persuasion or influence, did not refuse to allow further time for deliberation, or state that the amount offered for the assignment must be accepted then or never, and took no advantage of the patentee, except by concluding the bargain at the first interview, lasting about an hour, though the patentee's infirmities were manifest. *Held* that, as he had no notice of the importance that the patentee should have in mind his relations to the corporation, the facts did not show that he took any fraudulent advantage of the patentee's failing memory.

[Ed. Note.—For other cases, see Patents, Dec. Dig. ⬤⇒200.]

7. PATENTS ⬤⇒200—ASSIGNMENTS—CANCELLATION—SUFFICIENCY OF EVIDENCE.

In a suit to cancel a patent covering processes for coating one metal with another, evidence as to the value of the patent, which had been left in disuse for more than 11 years, *held* insufficient to show that the consideration paid for the assignment, $200, was so grossly inadequate as to raise a presumption of fraud, though the allegation that the amount in controversy exceeded the jurisdictional amount, $3,000, was not denied.

[Ed. Note.—For other cases, see Patents, Dec. Dig. ⬤⇒200.]

In Equity. Suit by Samuel H. Thurston and others against Philip L. Reed and others. On hearing on pleadings and proofs. Bill dismissed.

Francis J. V. Dakin and Rufus B. Sprague, both of Boston, Mass., and Thorndike Saunders, of New York City, for plaintiffs.

Philip C. Peck, of New York City, and J. Sidney Stone, of Boston, Mass., for defendants.

DODGE, Circuit Judge. The relief sought in this suit is the cancellation of an assignment by the plaintiff Thurston, executed by him February 25, 1914, of United States patent No. 706,701, which was issued to him August 12, 1902. The assignment purports to convey the patent to the defendant Reed for the sum of $200, the receipt whereof is acknowledged. The bill alleges that the assignment was procured by fraud practiced upon Thurston by the defendant Calder. It seeks also a reconveyance of the patent by the defendant United Metals Coating Company of America, to whom Reed has since assigned the patent, on August 4, 1914. A preliminary injunction, issued June 3, 1915, has forbidden its further transfer pending this suit.

As originally filed, the bill alleged nothing regarding the amount in controversy. An amendment allowed at the hearing, on July 15, 1915, sets forth that:

"The subject-matter of the controversy exceeds the sum of $3,000 value, exclusive of costs and interest."

The defendant has not disputed the jurisdiction of the court. So far as diverse citizenship of the parties is concerned, jurisdiction appears from the allegations of the amended bill.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In a further amendment, also allowed July 15, 1915, the plaintiffs tender the defendant corporation the $200 paid for Thurston's assignment of the patent to Reed. No such tender had previously been made.

When the plaintiff Thurston assigned the patent in question to Reed on February 25, 1914, as above, he was sole owner of it so far as the Patent Office records showed. By an assignment in due form, executed by him under date of April 16, 1901, he had conveyed two others patents, issued to him before the latter date, to Thurston Metal Company, a New Jersey corporation; and by the terms of that instrument he had also assigned to the same company and its legal representatives, for the same consideration:

"All improvements in the [processes described in said earlier patents] which I may hereafter invent, or improved processes for obtaining the same or similar products which I may invent or discover, and all patents which I may obtain under my own name or otherwise in the United States of America."

And by the same instrument he had also agreed:

"In case said patents were not taken out in the name of the company * * * to make or procure the assignments thereof to said company, in due form of law."

The patent now in controversy was issued to him after the date of the above agreements—on August 12, 1902, as above stated. It had been applied for before that date, on March 23, 1900. The two earlier patents, assigned as above, and also the patent in controversy, covered processes for coating one metal with another.

The Thurston Metal Company had therefore been entitled to a transfer from Thurston of the patent in controversy ever since its issue on August 12, 1902. But he had never so assigned it, nor, so far as appears, had he ever been asked so to assign it, doubtless because the Thurston Metal Company, organized in 1900 to operate under his patents, had not been successful. It had been "proclaimed" in 1911 for nonpayment of taxes by the Governor of New Jersey, had discontinued business, and has been since 1911 in the hands of its directors as trustees for creditors and stockholders for winding up purposes, according to New Jersey laws. Rev. 1896, §§ 53–55. Thurston is one of the directors; all are named as plaintiffs in the bill. As directors they were equitable owners of this patent on February 24, 1914, when Thurston undertook to assign it to the defendant Reed, and were, as between them and Thurston, entitled to an assignment of it from him for the creditors' and stockholders' benefit. The same is apparently also true as regards three other patents issued to Thurston since his above agreements, of April 16, 1901, with the Thurston Metal Company, with which, however, this case is not concerned. Besides the Thurston patents, owned or claimed by it, the company has no assets of any consequence.

Not only had the Thurston Metal Company omitted to procure from Thurston assignments of any of his patents issued subsequently to April 16, 1901, but it had also omitted to record his assignment of that date, wherein his agreements to assign said subsequent patents were contained; and this was never put on record at the Patent Office

until March 20, 1914, after the transfer to Reed now attacked (recorded March 5, 1914), and after the present controversy had arisen. Before that date the records referred to afforded no notice of its existence.

Thurston's patent No. 706,701, now in controversy, does not appear to have been utilized or considered with any view to its actual use from its issue in 1902 up to the year 1914. Investigations into a German electro-plating process having by that time led two independent groups of investors to seek control of this patent, both were trying in February, 1914, to find Thurston, its sole owner according to the records, in order to negotiate with him for its purchase.

The specification of this patent, signed by Thurston March 17, 1900, gave his residence as Long Branch, in the county of Monmouth, N. J., and his residence was so given in all the patents issued to him, except one; in No. 822,873, issued June 5, 1906, on his application filed April 1, 1905, his residence is given as Newark, N. J., but he appears to have gone in 1911, broken in health, to live with his brother in Hamburg, N. Y., a village not far from Buffalo, and to have remained there during the four years preceding February, 1914. In that month he was nearly 79 years old, somewhat impaired in health and in mental vigor, but still undertaking to manage his own affairs, with some assistance in details from his niece, Rose M. Thurston, about 20 years of age, who resided in the same house.

A representative of one of the groups above referred to called upon Thurston at Hamburg, on February 21, 1914, asked his price for the patent No. 706,701, and was told by him that it belonged to the Thurston Metal Company, as did all his patents. He was also informed by Thurston that negotiations regarding the patent must be made with Charles D. Fuller, the treasurer of the Thurston Metal Company, residing and doing business in New York City, and was given Fuller's address. Fuller was a steel merchant, a partner in the firm of Fuller Bros. & Co., which had carried on business for many years at 139 Greenwich street, the address given as above. He was an old friend of Thurston, had been treasurer and director of the Thurston Metal Company since its organization, and appears to have had the chief control of its financial affairs.

Four days later, on February 25, 1914, the defendant Calder arrived in Hamburg. His errand there was to see Thurston, find out whether he was the patentee named in the above patent, and, if he was, to buy it from him, if terms of sale could be agreed on. Calder was acting for the other of the two above groups. He knew nothing, so far as appears, of the application made to Thurston on February 21st as stated.

Calder had an interview with Thurston at his brother's house on February 25th. It lasted an hour or more. Its result was that, being satisfied as to Thurston's identity with the patentee named, Calder offered him $200 for an assignment of that patent to Reed, one of the persons composing the group represented by him. Thurston accepted the offer, took Calder's check for $200 on a Boston bank, executed an assignment to Reed, and delivered it to Calder, all before

Calder left the house. Calder had brought an assignment with him, previously drawn up by counsel, and requiring, to make it ready for execution, only insertion of the date, the consideration, and a correction in the statement of Reed's place of residence. The insertions and corrections were made by Calder in Thurston's presence. Calder signed as witness to Thurston's signature. A copy of the assignment as executed is annexed to the bill. Thurston having deposited the check, it was paid in due course March 2, 1915.

Exactly what took place between Thurston and Calder at this interview is in controversy. Except that Rose M. Thurston was there during part of the time, they two were the only persons in the room. Her testimony and that of Thurston himself contradict that of Calder. All three testified in person at the hearing. If fraud was ever practiced by Calder upon Thurston in regard to the assignment, it consisted in representations made during this interview. Calder denied making the representations testified to by the Thurstons, upon which the plaintiffs rely.

As set forth in the bill (paragraph 8), the representations were in substance as follows:

(1) That Calder had been sent to Thurston by Charles D. Fuller, above mentioned.

(2) That the patent had never been assigned to the Thurston Metal Company; that the company had no claim to it, it was independent of patents previously assigned, it was Thurston's property, and he was free to sell and assign it.

(3) That it had "only a year or two to run."

There are further allegations in the same paragraph that Calder also told Thurston he "could rely upon the facts being as stated by him," "that he was in great haste to return to Massachusetts and desired to have the transaction closed that day," and that "Reed did not desire to invest in said patent, but had agreed to take title * * * to accommodate him (Calder)." But these last statements, though included among those alleged to have been believed and acted upon as true by Thurston in executing the assignment, seem to add nothing material upon the question of fraud. Calder, as is not disputed, left Hamburg the same day for the East, and, if Thurston assigned the patent, it does not appear to have been a matter of any consequence to him whether he assigned to Reed or Calder. Whether or not the other alleged representations were fraudulently made is the question upon which the case turns.

[1, 2] As to those alleged representations, the evidence regarding that above numbered (3) may be first considered. According to Thurston's testimony, Calder said the patent had "only a short time" —"a few months"—to run. According to Rose M. Thurston, he said it "only had a short time to run"—"about a year or a year and a half, something of that sort." He stated, according to his own testimony, that the patent had "several years," or "a few years," to run. According to his testimony, also, he had a copy of the patent with him, he handed it to Thurston, Thurston examined it during the interview, and it was at hand, so that it could have been examined

throughout. Thurston's testimony was at first that he did not think Calder had a copy of the patent with him, and that "he didn't show it to me"; but on cross-examination he "could not swear to anything in regard to that, because I don't remember," or "I can't remember about it." Rose M. Thurston said she saw no paper produced by Calder, except the assignment.

The fact was, as reference to the patent would at once have shown, that it had about 5½ years to run. It seems to me improbable that Calder would in any event have intentionally misrepresented upon this point. More than two-thirds of the life of the patent having undoubtedly expired, statements by him, if made, that it had "only a short time to run," but going no further, could hardly amount to material misrepresentation. On the evidence I accept Calder's testimony that he had with him and produced a copy of the patent at the interview. He would not have been likely to go there without a copy. With a copy at hand, stronger evidence than is here afforded seems to me necessary for the conclusion that the patentee was actually deceived regarding the unexpired term of his own patent, to the extent of believing that only a year or two of it remained.

[3] The allegation referred to under (1) above, that Calder represented himself as sent to Thurston by Fuller, is the one mainly relied on by the plaintiffs, and the one regarding which the most serious conflict of testimony occurs.

Thurston himself, and Rose M. Thurston, who met Calder at the door and was thereafter present during the first part of the interview, agreed in stating that Calder, in introducing himself, said that he "came from" Charles D. Fuller, and that further talk followed about Fuller and his New York firm before the matter of the patent was taken up. Calder denied, on direct examination, that he ever told Thurston he had been "sent to him by" Charles D. Fuller, and said, further, that he never knew of Fuller, never heard of the Thurston Metal Company, and first heard of Fuller after he had given Thurston the check for $200; that Thurston then said, while waiting for pen and ink wherewith to execute the assignment, that "Mr. Fuller will be very glad to hear of this," thereafter explaining, in answer to an inquiry who Fuller was, that he was a very dear friend, who had been helpful to him, and would be glad to hear he had made something out of some of his patents. Until Thurston thus mentioned it, Calder "never heard the name before," according to his direct testimony.

It is claimed that reason to doubt the truth of these statements was afforded by Calder's cross-examination, in connection with testimony on the plaintiffs' behalf, as follows: On cross-examination Calder said that, while trying to discover Thurston's then residence, he had called, on February 21, 1914, upon Mrs. Mary K. Thurston, at 45 West Ninety-First street, New York, who proved to be the widow of Thurston's son, and that the information that Thurston was then living at Hamburg came from her. Calder at first denied that he showed her the patent, or that he got from her any further information, except that Thurston was an inventor, had been unfortunate, that Mrs. Thurston's daughter had been living with him at Hamburg until recently,

and that she herself had had no communication with him for some time. But during his further cross-examination, on the day following the above statements, Calder said he began the interview with her by asking if she knew the Thurston whose initials were similar to those on patent No. 706,701; that "she looked at it, and said they were the initials of her deceased husband"; and still later, though denying that she gave him Fuller's address, or mentioned Fuller's interest in Thurston's patents, or referred to the Thurston Metal Company as having conducted experiments relating to the patented inventions, he somewhat qualified these denials by saying that he was positive regarding them "so far as his recollection went."

Mrs. Thurston herself testified for the plaintiffs, in rebuttal, that she told Calder at the above interview that it would be better for him to see Charles D. Fuller, Thurston's partner, instead of hunting up Thurston himself, and that she got Fuller's address at the time from her telephone book to give to him. She added, it is true, that Thurston's address was all he seemed to care to know.

Calder had previously stated, on direct examination, that after his interview with Mrs. Thurston on February 21st he asked his counsel to ascertain from the records at Washington who was the registered owner of the patent No. 706,701, and that he got word in reply, on February 24th, that Thurston was the sole owner of record. He started for Hamburg the same day, broke the journey at Utica, and arrived at Thurston's house between 3 and 4 p. m. on February 25th.

A fact also disclosed by Calder for the first time during cross-examination was that he had himself visited Fuller's New York place of business, at 139 Greenwich street, in his search for Thurston's address. This he did on February 19th, two days before his interview with Mrs. Thurston. From lawyers in New York, whose names appeared in connection with one of the Thurston patents, he had learned that according to their records they had addressed letters to Thurston at 139 Greenwich street. During his visit there to follow up this clew, he learned from a clerk that one of the gentlemen there, at the time absent for his health, used to see Thurston there some years before. Calder's testimony was, however, that he made no further inquiry there, and, while there, neither heard Mr. Fuller's name mentioned, nor learned it in any way. Fuller, testifying for the plaintiffs in rebuttal, stated that the entire building at 139 Greenwich street was occupied by his firm, that the offices were two floors above the sidewalk, that on the side of the building, over the door through which access was had to them, "Dudley B. Fuller & Co." appeared in letters 10 to 12 inches high, and that "Fuller Bros. & Co.," with the street and number, appeared on the side of the doorway in white letters 3 to 4 inches high, on a black framework, in plain sight. This evidence was uncontradicted.

I find it difficult to believe that Calder could have gone away from 139 Greenwich street, considering the nature of his errand there, entirely ignorant of the name of the concern there located, or that, if Mrs. Thurston gave him the same address two days later from the telephone book, it made no impression on his mind. I am not pre-

pared to find that Mrs. Thurston's statement that she did so give Calder this address is false. If Calder's visit to Fuller's place of business and his subsequent interview with Mrs. Thurston had led him to apprehend that Thurston, though the sole patentee named in No. 706,-701, might not have retained sole ownership during the 11 or more years which had passed since it issued, such an apprehension may well have suggested the search at Washington set on foot by him on February 21st.

Nearly at the end of his cross-examination Calder stated, for the first time, that during their interview at Hamburg he told Thurston that 139 Greenwich street had been visited during the search for his address, but that the people there had said "they had heard nothing of Mr. Thurston for eight years; * * * that one of their gentlemen had been friendly with him, and was now away in the West." Thurston well knew that 139 Greenwich street was Fuller's place of business, and such a reference to it could hardly have failed to bring from him some mention of Fuller's name, if there had in fact been no previous mention of it, and, to the inquiry by cross-examining counsel whether Thurston did not thereupon remark that it was Charles D. Fuller's address, Calder replied that "he may have said it, but I don't remember it." Neither Thurston nor his niece include any mention by Calder of a visit to 139 Greenwich street in their accounts of what was said during the interview.

In view of all the evidence bearing upon the question, I am unable to believe that, when Thurston and his niece testified that Calder said he "came from" Fuller, they were inventing something for which there was no foundation whatever in fact. But, on the other hand, besides Calder's denial, there are many circumstances tending to forbid the conclusion that he ever told them, in so many words, that he "came from Charles D. Fuller." As will be noticed, neither Thurston's testimony nor that of his niece quite supports the allegation of the bill that Calder said he had been "sent to" Thurston by Charles D. Fuller; and, according to both, if he said he came from Fuller, he said nothing beyond those words to convey the impression that Fuller had sent him there about the patent, as might be expected, if he was really attempting to deceive. There is nothing to show knowledge on Calder's part at the time that Thurston had ever agreed to assign the patent, or that he had referred a former applicant for it to Fuller, or that he was unwilling to negotiate about it without Fuller's sanction. Calder could not have seen the unrecorded assignment upon which the Thurston Metal Company relies; so far as appears, he had talked with no one who could have told him anything about it, nor would any search of records have indicated its existence. He had no other reason, so far as appears, to think the mention of Fuller's name would help him with Thurston, than the information said to have been given him by Mrs. Thurston. I think the conclusion warranted, in view of all the above, that Calder used the name of Fuller, or referred to Fuller's place of business in some way such as conveyed to Thurston and his niece the impression that he did come from Fuller; but only

to that extent can I regard this allegation of the bill as supported by the evidence.

Fuller was, in fact, absent from New York between January 19 and March 3, 1914; and the fact was that on February 25th Calder did not know him and had never seen him.

[4] As to the allegations referred to under (2) above, there is no testimony, either from Thurston himself or from Rose M. Thurston, to any statements by Calder that the patent "had never been assigned to said Thurston Metal Company and was independent of patents previously assigned"—which is the language of the bill. Calder went no further, according to their testimony, than to say (after Thurston's statement that he had assigned some of his patents to that company) that the company had no claim whatever on the patent which Calder wanted to get; that he had been at Washington and examined it, and there was no assignment on record; and that the patent would revert to Thurston if the company had lapsed altogether, as Thurston thought might have been the case; or to assure Thurston that he had authority to assign it, and nothing could be done about it if he did assign it, there being no transfer on record. In all this I can find nothing amounting to false representation of a material fact. That no assignment appeared of record was true, and it was therefore true, also, that the patent was Thurston's property, and he was free to sell and assign it, so far as the records showed. If he undertook to tell Thurston what his rights would be if the company had lapsed, Calder cannot be regarded as having misrepresented facts. Thurston would have had no right to understand this as anything more than a statement of Calder's opinion, and as a matter of law.

[5] Unless, therefore, fraud is to be presumed from the respective circumstances of the parties, or is apparent from the bargain itself, I do not think the evidence sufficient to justify cancellation of the assignment. The clear, unequivocal, and convincing proof, going beyond a mere preponderance in the plaintiff's favor, necessary to establish actual fraud in such cases is wanting. See Atlantic, etc., Co. v. James, 94 U. S. 207, 24 L. Ed. 112; The Maxwell Land Grant Case, 121 U. S. 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; Southern, etc., Co. v. Silva, 125 U. S. 249, 8 Sup. Ct. 881, 31 L. Ed. 678; also, in this circuit, Marsh v. Cortis, 150 Fed. 121, 80 C. C. A. 75.

[6] It is said on the plaintiff's behalf that Thurston was not physically well or mentally alert, and it was therefore comparatively easy to influence him. The bill alleges only that he was at the time "very infirm and in poor health," an allegation denied by the answer. Except by the misrepresentations which it charges Calder with making, the bill does not allege that Calder unduly influenced Thurston.

Thurston's uncontradicted testimony was that he had a serious attack of neurasthenia about 1909; that for a time thereafter his son (since deceased) conducted experiments in his place for the Thurston Company, because he was too ill; that his condition had been such since he went to live in Hamburg in 1911 that no work on his inventions had been expected from him, and that he had been a great invalid; also at the time of his interview with Calder he was "not a

well man," or "a pretty sick man." At the trial of this case in July, 1915, it was apparent that his memory, as he testified, was "a little bad," and apparent, also, in my opinion, that impairment of his mental powers, through age or ill health, had proceeded far enough to render much patience and consideration necessary on the part of those with whom he might deal, in order to insure fully intelligent action in business matters on his part. He could by no means, however, be called incapable at the time of managing his own affairs, and only to the extent above indicated can it be said that he was not dealing on equal terms with Calder.

Except by saying, what was no doubt true, that he desired to close the transaction that day, and was in a hurry to get back to Massachusetts, there is nothing to show that Calder brought to bear anything like undue persuasion or influence upon Thurston's mind. No statement by him appears to the effect that the $200 must be accepted then or never, nor any refusal to allow further time for deliberation. No request for further time by Thurston appears to have been made. The utmost that can be claimed on the evidence, it seems to me, is that Calder concluded the bargain on the spot, notwithstanding that Thurston's infirmities were manifest during their interview, so as to show that he could not at the time remember the actual state of his relations with the Thurston Metal Company, as regarded his patents —a subject mentioned between them during the interview, as both agree. I do not think it can be said, however, that the evidence charges Calder with any notice of the importance to Thurston, or to the Thurston Metal Company, that the existing state of those relations should be present to Thurston's mind in making such a bargain. The absence of such notice to him was due to the failure of the Thurston Company, to put its assignment seasonably on record; and it is only the interest of the Thurston Metal Company in the patent that the bill is framed to protect. I do not find sufficient proof that Calder took any fraudulent advantage of Thurston's failing memory, still less that he brought to bear influence or constraint such as Thurston was too weak to resist. See Conley v. Nailor, 118 U. S. 127, 6 Sup. Ct. 1001, 30 L. Ed. 112; Ralston v. Turpin, 129 U. S. 663, 670, 9 Sup. Ct. 420, 32 L. Ed. 747.

[7] It remains to consider whether there was gross inadequacy of price, such as to raise a presumption of fraud in the bargain. Except for the fact that in February, 1914, ownership of the patent was being sought by two independent interests, so that its owners, had they been aware of the facts, might presumably have had competing offers from both, there is little reason to believe that it had substantial value at the time. Its owners had left it in disuse for more than 11 years, during which period no offer for it appears to have been made. The bill alleges (paragraph 11) that it is "of great value in the metal art, in the electrotyping art, and in other arts," and that the plaintiffs will suffer "a great and irreparable loss," unless reconveyance is ordered. Calder's answer admits that the patent is "of value in the metal arts." The evidence relied on to show its value at the time of the assignment is in substance as follows:

On July 16, 1914, Calder organized the defendant Metals Coating Company of America, whereof he became president; the other incorporators, besides Reed, being the other persons under whose instructions Calder acted in procuring the assignment to Reed. Its capital stock was $100,000, and to it Reed assigned this patent on August 4, 1914. Although the bill alleges that a large proportion of this stock was issued in payment for the Thurston patent, the allegation is denied, and the plaintiffs have offered no proof of it. The defendants' evidence is that the company acquired certain other patents, for which $55,000 has been paid, and more is to be paid, if experiments with them result favorably; also that the Thurston patent was acquired only for purposes of protection. This evidence does not seem to afford a satisfactory basis for any safe estimate of its value.

From the plaintiff's evidence it further appears that on March 13, 1914, Fuller, acting in New York on behalf of the owners of 53 per cent. of the stock of the Thurston Metals Company, and not having then learned that this patent had been assigned to Reed, entered into an agreement with Morton D. Connolly, representing the investors on whose behalf Thurston had been approached on February 21, 1914, whereby Connolly undertook to pay $25,000 for all that company's stock. Connolly testified that he was familiar with the electroplating art, that the process described in Thurston's patent 706,-701 could be used, instead of electroplating, so as to save 50 per cent. in time and cost, and that he made the above agreement for the purpose of getting that particular patent. He further stated that the patent would be "worth $100,000 to him, provided he secured a purchaser for it"; but a statement of this kind is obviously of little weight upon such a question, nor can I regard Connolly's opinion as to what could be accomplished by use of the patented process as of much consequence. It is not shown to have been an opinion based on any actual experience or experiment, or to be anything more than a speculative opinion. It is supported by no other evidence.

The patent was without demonstrated value at the time, nor could it be proved valuable without the expenditure of time and money, and only $5\frac{1}{2}$ years remained within which profitable use could have been made of it in any event. As the defendants urge, "the uncertainty and highly speculative nature of patent values are notorious," and estimates of such values based on opinion only can hardly be accepted for the purposes of a question like the present. See American, etc., Co. v. Merchants', etc., Co. (D. C.) 216 Fed. 904, 910. Although, as has been stated, the defendants have not denied the allegation that the jurisdictional amount is involved, I am not satisfied that gross inadequacy of price is shown with sufficient certainty to justify cancellation of the assignment on that ground alone.

The above conclusions require dismissal of the bill, and there may be a decree accordingly.