## In re GEORGIA STEEL CO.

(District Court, N. D. Georgia. March 8, 1917.)

No. 402.

1. CORPORATIONS ⬤⟂314(3)—CONTRACTS—VALIDITY—COMMISSION TO OFFICER.
The payment to an officer of a corporation of a commission on the sale of property to the corporation, which commission the vendor had agreed to pay before the agent became an officer of the purchasing corporation, and which was recorded in the minutes of the meeting of the vendor's board of directors and openly mentioned by the vendor's officers and other representatives in communications with the representatives of the purchaser, was not the payment of a secret commission, and did not render the sale either voidable or void.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1397.]

2. BANKRUPTCY ⬤⟂140(2)—SALES—FRAUD—REPRESENTATIONS AS TO VALUE—EXAMINATION BY PURCHASER.
Statements made by the president of the vendor corporation and by his son as to the value of mining lands sold by it and as to the quantity

⬤⟂For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of mineral thereon, though exaggerated, do not defeat the vendor's claim against the purchaser's trustee in bankruptcy on the bonds given for the purchase price, where the evidence showed that the representations were not knowingly false, but were believed to be true, and that the purchaser had the amplest opportunity to examine the property by its experts without objection by the vendor, and where two years afterward the purchaser, after defaulting in the interest on the bonds, made important concessions to the vendor to get the mortgage reinstated.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 219.]

3. VENDOR AND PURCHASER ☞44—FRAUD—DEGREE OF PROOF.

The evidence to establish fraudulent misrepresentations in the sale of land must be clear, unequivocal, and convincing, going beyond a mere preponderance in plaintiff's favor.

[Ed. Note.—For other cases, see Vendor and. Purchaser, Cent. Dig. §§ 69–76.]

4. BANKRUPTCY ☞228—ORDER OF REFEREE—REVIEW BY COURT.

While the findings of the referee in bankruptcy on questions of fact will not be interfered with unless clearly erroneous, the court must form its own conclusions where the referee's conclusions were drawn largely. from undisputed facts and appear to be clearly erroneous.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 387.]

5. BANKRUPTCY ☞308—CLAIMS—BONDS—PRIVITY.

Where a foreign corporation contracted to purchase property in excess of the amount it could legally hold and organized a domestic corporation to take the property, there was sufficient privity between the two to enable the vendors to claim against the trustee in bankruptcy of the domestic corporation on the bonds given for the purchase price secured by mortgage on the property.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 496–507.]

In Bankruptcy. In the matter of the Georgia Steel Company, bankrupt. On petition of the Georgia Iron & Coal Company and others against O. T. Peoples, as trustee in bankruptcy, to review an order of the referee disallowing petitioner's claim against the estate. Order reversed, and claim allowed.

See, also, 224 Fed. 517.

Anderson & Rountree and King & Spalding, all of Atlanta, Ga., for bondholders and trustee for bondholders.

Chambliss & Chambliss, of Chattanooga, Tenn., Paul F. Akin, of Cartersville, Ga., and Sam. B. Adams, of Savannah, Ga., for trustee.

NEWMAN, District Judge. The matter for consideration here now grows out of an application to review a certain decision of C. D. McCutchen, referee in bankruptcy, as to the allowance of a claim made by certain bondholders and the trustee for the bondholders to prove their bonds and to have a lien on the property of the Georgia Steel Company declared in their favor. Perhaps the question here would be better stated by an order made by the referee in the case, which is as follows:

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

"Georgia Iron & Coal Co., Joel Hurt, Mrs. Joel Hurt, Mrs. Mabel Bickerstaff, Mrs. Eva L. Simms, H. L. Woodruff, C. E. Buek, Equitable Trust Co., of New York, Bondholders, Trust Company of Georgia, Trustee for the Bondholders under the Mortgage, vs. O. T. Peoples, Trustee in Bankruptcy.

"Proof of Claim of Secured Debt and Objections Thereto, Before Honorable C. D. McCutchen, Referee in Bankruptcy.

"The above-named bondholders and the trustee therefor having filed in the office of the referee a proof of claim against the estate of the above-named bankrupt, as a secured claim, secured by a mortgage on the property of the bankrupt in the sum of $897,000, principal, besides interest at the rate of 5 per cent. per annum from October 1, 1910; the alleged indebtedness being claimed as the unpaid purchase price of the property of the Georgia Iron & Coal Company now standing in the name of the bankrupt; and the evidence of said claimed indebtedness being said bonds of the bankrupt held by the above-named bondholders secured by a trust mortgage; and said claim, bonds, and mortgage having been objected to by the trustee in bankruptcy, and the objections having come on for hearing before me, and testimony having been offered in behalf of said bondholders and the trustee therefor in support of said claim, and by the trustee in bankruptcy in opposition thereto; and due deliberation having been had; and after hearing C. L. Anderson, D. W. Rountree, and A. C. King, Esquires, attorneys for said bondholders and tne trustee therefor, in support of said claim and mortgage, and S. M. Chambliss and Paul F. Akin, Esquires, attorneys for the trustee in bankruptcy, in opposition thereto: It is ordered that the said claim and mortgage be, and the same are hereby, disallowed and the objections thereto sustained, and the several claims of each of the said bondholders and the trustee therefor are disallowed and the objections thereto sustained."

The referee, in his certificate goes thoroughly and elaborately into the questions involved in the case. On the objection of the trustee in bankruptcy, as will be seen, the referee refuses to allow the bonds to be proven. In order to reach this conclusion the referee heard a large amount of testimony, pro and con, heard extensive argument by counsel, and made a very elaborate report and opinion on the facts and legal questions involved in the certificate filed by him in the case.

The bonds were given for the purchase money of the property of the Georgia Iron & Coal Company, sold by it to the Southern Steel Company, a foreign corporation, the purchasers subsequently becoming incorporated as the Georgia Steel Company, a domestic corporation, because of the difficulty of a foreign corporation holding lands to the amount necessary to carry out the purchase and to the extent involved in the purchase.

The objections to the proof of the bonds were upon the grounds, stating them briefly and without quoting:

First, that there was misrepresentation and fraud as to the value of the property sold by the Georgia Iron & Coal Company to the vendee on the part of the vendor company; second, that there was secret commissions paid by the vendor company to certain officers of the vendee company for the purpose of bringing about the sale, which were fraudulent and rendered the contract invalid and unenforceable.

The Georgia Iron & Coal Company sold a very large amount of property, consisting of tracts of land in various counties in North Georgia, the land conveyed amounting in all to something like 50,000 acres. One part of the property sold was property supposed to contain coal, and which had been largely mined for coal, and was then being

mined. A large amount of appurtenances and outfit which are usually attached to coal mining properties were included in one part of the state, in Dade county mainly, and another part, containing iron ore, in other counties, and especially and principally in Bartow county. A full description of all this property is set out in the pleadings and the proof, and it is unnecessary to refer to it more particularly in deciding the questions which are here for determination.

It appears that in the spring or summer of 1906, the Georgia Iron & Coal Company had become considerably indebted, and its creditors were pressing it to some extent for the collection of their debts. A creditors' committee, it seems, was formed, consisting of Mr. Charles E. Currier, president of the Atlanta National Bank, Mr. Ernest Woodruff, of the Trust Company of Georgia, and Mr. Thos. D. Meador, vice president of the Lowry National Bank. Mr. Meador seems to have been intrusted by that committee, acting apparently through Mr. Currier, with the task of selling the properties of the Georgia Iron & Coal Company. Mr. Meador, from the evidence, seems to have gone about the work earnestly, and in doing so secured the services of one C. E. Buek, whom it is said, in turn secured the services of one Oakleigh Thorne, to assist him in making the sale. It is to these two last-named parties, Buek and Thorne, that it is claimed the secret commissions were improperly paid.

Mr. Meador proceeded with the work of making a sale, and finally made a sale on September 12, 1906, to the Southern Steel Company. He seems to have been dealing mainly with Moses Taylor and R. B. Van Cortland, as representatives of the Southern Steel Company. Meador made the contract for the sale of all the properties apparently for an amount and on terms which he thought would be satisfactory to Mr. Joel Hurt, who was the main representative of the Georgia Iron & Coal Company and the person mainly interested in it and in the sale. After Meador had made the sale to the Southern Steel Company and when Mr. Hurt heard of the sale, he very earnestly objected to the sale and refused to carry it out, declining positively, it seems, to execute the contract, claiming that Meador did not have the authority to make the sale, and that the terms agreed upon were not satisfactory to him.

It appears clearly from all the evidence that Hurt protested vigorously against the sale made by Meador. It seems that Hurt, at the time he heard of the sale by Meador, was in Cincinnati, and he says in his testimony that when he heard of it he wired Meador at his hotel in New York, protesting against any attempt of a sale of these properties by him. He says also:

"I wired George (that is, his son George Hurt) to follow up Woodruff and Meador and protest to both of them against any interference on their part with the sale of these properties; that I was then negotiating at a price I had no idea they would obtain, no such price, I think, is my recollection. I sent several telegrams to him and to Mr. Meador, all protesting. At the same time I sent a telegram to Mr. Currier, asking him if he had given Meador any authority to withdraw it, because I would not permit such a sale to go through. Meador wired me finally that he had perfected a sale, and I wired him back to notify the parties that I would not allow them to receive the property, and protested that he hadn't the authority. I wanted him to notify them—to do me that much service to notify them I wouldn't consent to a

sale of the property, and he wired me that he had notified the parties but that it was after he had made the sale. So we met in Atlanta."

Mr. Hurt then, in his testimony, described a visit to Mr. Currier and his protesting against the sale and the authority he was supposed to have given Meador.

Mr. George Hurt, in his testimony, says that he was in New York at the time his father heard of the sale by Meador, and says his father wired him to put Mr. Meador on notice that such a trade as proposed would not be consummated, and Mr. Meador had better not bind himself to it. He says that was on September 10, 1906, and that he saw Meador and notified him as requested, and says that Mr. Meador told him, on September 12th, that he had made the trade. George Hurt's testimony shows that he protested earnestly to Mr. Meador, and also to Mr. Ernest Woodruff, who seems to have been in New York assisting Mr. Meador, against the trade being consummated and against their right to consummate it.

At this time Mr. C. P. Perin, at the instance, it seems, of the Southern Steel Company, came to Atlanta for the purpose of inducing Mr. Hurt to accept and comply with the contract of sale made by Mr. Meador with the Southern Steel Company, and after a number of interviews and considerable discussion and negotiation, such changes were finally made in the proposed contract of sale as resulted in Mr. Hurt's agreeing to the sale, and on October 10, 1906, an agreement was entered into between Hurt, president of the Georgia Iron & Coal Company, and the Southern Steel Company, in pursuance of which the bonds which are the subject-matter of this litigation were issued.

During these negotiations there were two letters written, that are now in evidence, which, it seems to me, throw light on this whole matter, one written from Atlanta by Mr. Meador, who had then returned from New York where this sale was made, to Mr. Moses Taylor, in New York, and the other from C. P. Perin, who was, as stated, then in Atlanta, to Mr. Taylor, in New York. They both show one outstanding fact that is to me very material in the consideration of this case and the two questions involved. This fact which is so prominent and to a large extent controlling here is that Hurt was not sufficiently anxious for the sale made by Meador to be consummated to have induced him to become a party to any misrepresentations or fraud, but his unwillingness to accept and consummate Meador's trade is inconsistent with the idea of his using the means to bring about the sale which are attributed to him. The letters to which I refer are as follows:

"Atlanta, Ga., Sept. 16, 1906.

"Mr. Moses Taylor, New York, N. Y.—Dear Sir: Carrying out the notice to me, which I read to you over the phone before leaving New York, Mr. Joel Hurt says that the trade for the iron properties had been made without his consent and that he will not allow it to go through as agreed to by me and Mr. Currier.

"He claims, that notwithstanding he signed authority to Mr. Currier, for the Georgia Iron & Coal Company, and that said authority was confirmed by the board of directors of said company, that notwithstanding he agreed at the directors' meeting to have a stockholders meeting called, in case the attorney of the company deemed it necessary for the purpose of confirming

this authority to Mr. Currier, as a matter of fact he failed to do so, and the stockholders have not authorized the authority to Mr. Currier.

"Mr. Hurt now claims that he will recommend to the stockholders not to confirm the sale, and if they fail to confirm it, it cannot be made legally. Considering these objections of Mr. Hurt, and the difficulties they bring about, I have taken it up with Mr. Hurt, to see if I could not satisfy him, and find the objections to apply to the royalty, sinking fund, the land titles and the live stock, and he consents that if the contract is made to read, viz.:

" 'Royalty brown ore 25 cts. per ton for first 150,000 tons.

" 'Royalty brown ore 50 cts. per ton for balance.

" 'Royalty manganese 10 per cent. of market price, and applied to sinking fund for bonds each year, the minimum of which shall be for:

First five years.................................................$25,000 each year.
Second five years...............................................$50,000 each year.
Balance of life of bonds.........................................$62,500 each year.

" 'Land titles shall be delivered to attorneys at once, and such as the company holds shall be accepted, or the whole declined by October 1, 1906.'

"That the live stock belonging to company shall be taken as part of quick assets, and paid for cash.

"It is important that possession should be taken at once to preserve the organized labor, and he also requires that all improvements on property shall be charged to the purchaser from date (September 12), and that possession should be taken by October 1, 1906, and that with a further agreement about commissions which I will take up with Mr. Buek, he will consent to closing the trade.

"The difference in the agreement which I signed and this, as I understand it, amounts only in actual money to the concession of the value of the live stock; the difference in royalty being applied to sinking fund being only a question of an advance payment on the bonds.

"The question of the land titles, since the company has full abstracts of titles, can be easily considered by attorney within the time prescribed. The live stock is largely used on the company's farms, and is really not a part of the mining outfit. The question of paying for improvements is important for the reason that the force of mechanics and other operatives would become scattered and disturbed if they were to stop these improvements.

"I wish you to understand that so far as Mr. Currier is concerned, he stands in good faith by the authority given me in the telegrams which I exhibited to Mr. Wickersham, to make the agreement from, and so far as I am concerned, I stand by the trade according to the authority detailed to you at the time the agreement was made.

"Considering the importance of this transaction, I feel that the difference is so small that it is better to yield than to undertake to enforce the agreement by litigation. The cost of lawyers would, be more than the money involved, and since you are buying the property at a low price, you can afford to be liberal in closing it up. I think Mr. Hurt should indorse my agreement without objection, but since he will not do so, the matter is submitted to you, and I trust it can be arranged by wire in direction to Mr. Buek to come here and close it up.

"I very much regret having to make such a report to you."

"Very truly yours,                    Thos. D. Meador.

"Please wire me that a majority of your board has agreed to vote for this purchase at next meeting.

"I mail copy of this to Mr. Buek."

"Atlanta, Ga., Sept. 21, 1906.

"Moses Taylor, Esq., President, 30 Pine Street, New York City—Dear Sir: Since last Monday I have been with Buek and Schuler either at Chattanooga, Gadsden or Birmingham. On receipt of Mr. Meador's letter, we thought it best to come here and try our hand upon Mr. Hurt. We have wired you per inclosed copy, and I hope you will be able to start a man in this direction as early as possible to examine the titles.

"If Strong and Cadwalader have no one available for this work, I suggest your employing King, Spalding & Little, 1403 Empire Bldg., Atlanta, Ga.

"We have gone over Mr. Hurt's objections in the presence of Mr. Meador, and I am convinced that Mr. Currier would have a good deal of difficulty in proving his authority to execute the contract in the face of Mr. Hurt's protest. As Mr. Hurt owns 80 per cent. of the stock, a legal ratification by the stockholders of the action of the board of directors in selling the property could not be obtained without his consent.

"Mr. Hurt is to hand me this evening, which I will mail at the earliest possible moment, the form of contract which he is willing to sign. The essential feature of his modification of contract is first an increase in the payments into the sinking fund; second, payment for the live stock, which amounts to about $7,000.00; third, the increase in the royalty upon the manganese ore from 5 cts. per ton to 10% of the selling price.

"This last feature is immaterial as the manganese mines can be leased at $1.00 per ton royalty.

"Hurt evidently has some bona fide firm in Cincinnati who are prepared to reorganize his company. I judge Rogers, Brown & Company have found the capital for him. After looking over the ore situation at Bartow, where I shall spend the next two days, I can advise you as to the advisability of making any concession. Buek and I feel that we should have this ore, if it can be secured. Fortunately there are very few contracts out for the sale of ore. The furnace, however, is sold for the next six months at figures which they state are the top of the market. They will submit their contracts this evening for both ore and pig iron.

"I shall leave Cartersville for Birmingham Sunday night, spend Monday in Birmingham, and will be in New York on Friday. Mr. George Schuler will attend the meeting and wishes to bring up the question of working capital for the three furnaces plants.

"I am, yours very truly,                    [Signed]   C. P. Perin."
"P. S. The Schulers are not in favor of the Ga. purchase.        C. P. P."

In the letter from C. P. Perin to Moses Taylor, it will be seen, he says:

"Hurt evidently has some bona fide firm in Cincinnati who are prepared to reorganize his company. I judge Rogers, Brown & Company have found the capital for him."

[1] This brings us naturally and logically to the consideration of the question, first, as to whether the matter of the commissions paid by Meador, or through Meador to Buek and Thorne, are sufficient to vitiate this sale and render invalid the bonds and the deed of trust given to secure the same.

In the first place, these commissions were arranged for by Meador entirely, so far as the evidence shows, without the knowledge of the officers of the Georgia Iron & Coal Company, and especially without the knowledge of Mr. Hurt, the one mainly interested in the same. It seems that Meador first arranged with Buek, and Buek, according to the claim here, with Thorne. Now, the arrangement that Meador had with Buek, according to Meador's testimony, was some time before the trade was consummated. Meador says that he and Buek negotiated for quite a while working up the trade. He did not remember exactly when they had a definite understanding about commissions.

Looking first at whether or not these commissions were secret, let us see what occurred. The first time the commissions were mentioned, I find, is in the letter from Meador to Moses Taylor, on September 16th. Of course this was after Meador's sale had been made, but be-

fore the final sale by Hurt was made. In that letter he says, after stating that Mr. Hurt wanted certain things done, "and that with a further agreement about commissions which I will take up with Mr. Buek, he will consent to closing the trade." This shows an utter lack of desire to keep the matter of commissions a secret. On the contrary, it shows that it was being treated by Mr. Meador as a matter about which there was no secrecy at all, and which there was no harm in mentioning to Mr. Taylor, the purchaser. It could mean only one thing, it seems to me, and is sufficient, of itself, to show the entire publicity of the matter, so far as Meador was concerned, at least. · In addition to that, it seems that in 1908, some question arose about deferring the payment of the interest on certain bonds, and George Hurt, the son of Joel Hurt, wrote to Mr. Chambliss, in Chattanooga, and in his letter spoke of certain bonds as having been given to Buek as commissions in the matter. George Hurt was representing his father in the matter, and was well known to be connected with the whole matter of the managing of the properties and of the sale of the same. It is unnecessary to go into the matter treated of in the letter from George Hurt to Chambliss. It is sufficient to say that George Hurt, in his letter, made no secret of the matter at all, but spoke of it as if it was a well-known and well-understood thing that Buek had received certain bonds in connection with the sale of the property.

In addition to all this, the whole matter was placed on the minutes of a meeting of the board of directors of the Georgia Iron & Coal Company held on January 3, 1907, as follows:

"Resolved, that the president of this company be, and he is, hereby authorized and directed to deliver to C. E. Buek as commission for aiding and effecting sale of the properties of this company as per contract of Oct. 10, 1906 with the Southern Steel Company, 45 of the first mortgage bonds of the Georgia Steel Company, which are to be received by this company in part payment for said properties, said 45 bonds to be numbered 956 to 1000, inclusive, and delivery of same to said Buek to be whenever this company shall have arranged with the holders of the same as security for their surrender to this company."

There is very little testimony as to whether the bonds supposed to go to Thorne really went to him. As I understand it, Buek stated to C. P. Perin, a representative of the Southern Steel Company, that he did not intend to keep his bonds. It may be stated right here that Perin knew about the matter, and was satisfied with Buek's statement about it.

When they came to close up the sale after it had been effected in October, 1906, Meador called Hurt's attention to this commission, or at least it came up between them, and Hurt protested that $60,000 was too much, and finally agreed to pay $45,000 in bonds, and the $45,000 in bonds seems to have been delivered. Exactly how they were delivered is a little doubtful, but it would seem that Meador's were probably delivered to him in person, or delivered to him through a representative of the Trust Company of North America, who undoubtedly received the bonds for Buek and Thorne, as it seems from the testimony.

It is perfectly clear from the evidence that the negotiations between Meador and Buek occurred long before Buek became connected, as an

officer, with the Southern Steel Company. That he subsequently became an officer of the Southern Steel Company would hardly be sufficient to annul this whole transaction.

What impresses me most with reference to the insufficiency of this matter of secret commissions to void the transaction is the entire openness of the whole matter, as I have indicated, the entire lack of any concealment about it being to me clear evidence that nothing wrong was intended, or supposed to be attached to this part of the transaction. The referee says:

"I am forced to the conclusion that the commissions paid were of such character that, under the law, the payment would render the contract voidable if not void."

I am wholly unable, after the most careful consideration, to agree with him about this. I do not believe that they were "secret commissions" in any proper view of that term.

[2] The next question is whether there was such conduct in reference to the value placed upon the property sold as would justify the referee in taking the view he did of the transaction. The referee quotes sections 4113 and 4114 of the Code of Georgia of 1910, and says his finding is made on each of the grounds of misrepresentation as to the property. These sections are:

"Sec. 4113. Fraud may exist from misrepresentations by either party, made with design to deceive, or which does actually deceive the other party; and in the latter case such misrepresentation voids the sale, though the party making it was not aware that his statement was false. Such misrepresentation may be perpetrated by acts as well as words, and by any artifices designed to mislead. A misrepresentation not acted on is not ground for annulling a contract.

"Sec. 4114. Concealment of material facts may in itself amount to a fraud—

"1. When direct inquiry is made, and the truth evaded.

"2. When, from any reason, one party has a right to expect full communication of the facts from the other.

"3. Where one party knows that the other is laboring under a delusion with respect to the property sold or the condition of the other party, and yet keeps silent.

"4. Where the concealment is of intrinsic qualities of the article which the other party, by the exercise of ordinary prudence and caution, could not discover."

The case of Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678, seems to me to state the law applicable to and really controlling in this case. It was a case of the sale of a mine and an attempt to set aside the sale. While the referee here, doubting his authority to make a decree of rescission, only refused to allow the collection of the balance due on the bonds under this mortgage, still he held that the sale was invalid in such way as that a court of equity, under a proper proceeding, would have decreed a rescission. The rule laid down in the Silva Case is:

"In order to rescind a contract for the purchase of real estate on the ground of fraudulent representation by the seller, it must be established by clear and decisive proof that the alleged representation was made in regard to a material fact; that it was false; that the maker knew that it was not true; that he made it in order to have it acted on by the other party; and that it was so acted upon by the other party to his damage, and in ignorance

of its falsity and with a reasonable belief that it was true. Statements made by the seller of a speculative property like a mine, at the time of the contract of sale, concerning his opinion or judgment as to the probable amount of mineral which it contains, or as to the character of the bottom of the ore chamber, or as to the value of the mine, if they turn out to be untrue, are not necessarily such fraudulent representations as will authorize a court of equity to rescind the contract of sale. The fact that a representation made by a seller was false raises no presumption that he knew that it was false. When the purchaser of a property undertakes to make investigations of his own respecting it before concluding the contract of purchase, and the vendor does nothing to prevent his investigation from being as full as he chooses, the purchaser cannot afterwards allege that the vendor made representations respecting the subject investigated which were false."

These are quotations from the headnotes of the case, but the court says in the opinion that:

In a case like this "the burden of proof is on the complainant; and, unless he brings evidence sufficient to overcome the natural presumption of fair dealing and honesty, a court of equity will not be justified in setting aside a contract on the ground of fraudulent representations. In order to establish a charge of this character the complainant must show by clear and decisive proof: First, that the defendant has made a representation in regard to a material fact; secondly, that such representation is false; thirdly, that such representation was not actually believed by the defendant, on reasonable grounds, to be true; fourthly, that it was made with intent that it should be acted on; fifthly, that it was acted on by complainant to his damage; and sixthly, that in so acting on it the complainant was ignorant of its falsity, and reasonably believed it to be true."

[3] Now, the evidence to establish these must be clear, unequivocal, and convincing proof, going beyond a mere preponderance in the plaintiff's favor necessary to establish actual fraud. Atlantic Delaine Co. v. James, 94 U. S. 207, 24 L. Ed. 112; Maxwell Land-Grant Case, 121 U. S. 325, 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; Marsh v. Cortis, 150 Fed. 121, 80 C. C. A. 75; Thurston v. Reed (D. C.) 229 Fed. 737, 745.

I do not know exactly what view of the law the referee had. In his certificate he cites the Silva Case as having been brought to his attention, but says it is distinguished in Kell v. Trenchard, 142 Fed. 16, 73 C. C. A. 202. Speaking of certain statements made by Silva, in the Silva Case just referred to, in the opinion by Mr. Justice Lamar, it is said:

"Such statements are not fraudulent in law, but are considered merely as trade talk, and mere matters of opinion, which is allowable. Gordon v. Butler, 105 U. S. 553 [26 L. Ed. 1166]; Mooney v. Miller, 102 Mass. 217."

Any statements made by Hurt would not be false or fraudulent in the referee's own view of the matter, according to what he says of him in his certificate, even as modified and explained in his amended certificate. In his certificate, in speaking of Joel Hurt and George Hurt, the referee says:

"Their testimony negatives all idea of any intention on their part to deceive, or to make or permit to be made any representations that they did not believe to be justified by such belief. A careful reading of the testimony clearly develops the fact that both these witnesses base their confidence in the property largely upon theory, and they have to a large extent disregarded the

proven results of actual experience with the property. They show unbounded confidence in the existence of vast quantities of mineral still existing in the property and not yet exhausted, and this belief seems to amount to an obsession. Their testimony, viewed in the light of all the other proven facts in the case, leads forcibly to the conclusion that this mental attitude has had a tendency to blind them as to the force and weight which must be given to the negative results of the investigations made on the property and actual experience in operating it."

The referee further says:

"There is very forcible evidence of a keen desire on the part of the management of the Georgia Iron & Coal Company to obtain the most advantageous price possible for the property, and, coupled with the findings of fact elsewhere set out, what amounts to very strenuous "puffing" of the property. This is particularly true as to the coal property, and to somewhat less degree to the iron ore."

There is no doubt whatever from the evidence that the Southern Steel Company had the amplest opportunity to examine this property. They had experienced experts to go over it, and there seems to have been not the slightest objection to their making a very full examination and to giving them all the facts connected with the property.

The Silva Case has not been reversed or criticized in any way by the Supreme Court, and, taking it as authority upon the legal question at issue here, is the proof in this case sufficient to justify the conclusion of the referee? I have stated the rule as laid down in that case and the extent to which the proof must go. It must be beyond a mere preponderance of the evidence, to justify the rescission of a contract such as this. It must demonstrate the facts necessary to justify a rescission.

If the Hurts had the unbounded belief in the value of this property which must be accorded to them, what else was done by them, or by their corporation, or what was omitted to be done which should have been done, under the evidence, sufficient to justify a rescission of this contract, or to justify even what the referee did in refusing to pay the balance of the purchase money? They furnished to the people investigating this property, apparently, or they were furnished by their employés, various reports on these coal properties and ore properties, all of them made, apparently, by men of experience and ability in their profession, some of them unusually able men, and all of them men of ample qualifications, at least judging from the evidence. Men buying property like this, or representing corporations buying properties such as this, are held to a reasonable degree of care and diligence themselves, to look into papers, reports, and statements made to them. I do not understand the rule to be that they can blindly go on and make a trade and then claim that things were not as they thought them to be, although at every stage of the proceeding they had the fullest opportunity of ascertaining the truth or falsity of what they heard connected with the property.

I have not attempted, and shall not attempt, to go into details as to all the testimony of all the witnesses, or into details as to the minute questions raised in the case. The two great questions are: First, whether there were secret commissions given to the officers of the

Southern Steel Company to effect the sale; and, second, whether there was such misrepresentation and lack of fairness on the part of the Georgia Iron & Coal Company and its officers as to the value of the property, to justify the finding of the referee.

It is a serious thing to set aside a sale which has been entered into and consummated, certainly between people on both sides of high intelligence and extensive experience with the matters with which they are dealing, on the ground that one has cheated the other, or unfairly or illegally outwitted the other in the trade. Conclusions of that sort will not be reached except upon the amplest and fullest evidence regarding the same.

[4] I wish to say right here that the referee who had this case and who decided it is one of the ablest referees in the service in this district. He is a lawyer of ability and a gentlemen of the highest standing and character. He has been a joy to me as an official ever since he has been in office, for some 18 years now, and I have no doubt that he reached his conclusions after the most careful consideration, but I am unable to agree with him. The rule that the findings of the referee on questions of fact will not be interfered with unless clearly erroneous is fully recognized by me—I have stated that many, many times—but in this case if his findings are erroneous at all, they are clearly and manifestly erroneous. The conclusions reached by the referee are drawn largely from undisputed facts, and as to these the court must form its own conclusions as well as the referee. Besides, the conclusions I have reached are clear to me, and consequently my duty is plain.

I think it is unnecessary to hold that the trustee and the parties he represents are estopped from objecting to the proof of the bonds and the establishment of the lien of the mortgage in this case because of their agreement to reinstate the mortgage when it was being foreclosed in 1908. I do think, however, that goes in as very persuasive evidence that they, after the fullest opportunity to examine the property, were entirely satisfied with their trade. Concessions were made by the representatives of the Southern Steel Company in order to have the mortgage reinstated after they had defaulted in the payment of interest, and at that time they must have considered the trade all right and were satisfied with it. If there was any real merit in the questions which are now being raised as to the validity of this sale, it does seem that they would have been known at that time to the Southern Steel Company and its officials, and to have gone on and re-established the mortgage voluntarily after full negotiations about it, assisted by very able counsel, shows that they were perfectly satisfied with the matter long after they ought to have ascertained what the truth about the whole transaction was.

[5] I think that as to the question of privity between the vendor company and the Georgia Steel Company there can be no question at all. I have stated that the Georgia Steel Company was organized because of the prohibition of foreign corporations owning more than 5,000 acres of land in Georgia (Parks Code of Georgia, § 2206), and there is no doubt that the trade with the Southern Steel Company was

made with the understanding that it would result in the forming of a domestic corporation. I do not think there is anything in the question raised here by the bondholders as to that.

It is unnecessary for me to determine whether the vendee company and its trustee are barred by laches from making the question it has here, as I think the objections made to the proof of these bonds and the establishment of the lien of the trustee are without merit. Perhaps if I should hold upon it, I should be disposed to hold that they have waited too long to make the question, when they must have had full knowledge of all the facts, certainly as to the value of the property, and, from the testimony here, full opportunity to ascertain about the commissions claimed to have been paid to Buek and Thorne.

Consequently I am unable to agree with the findings of the referee in this case, and I shall decline to confirm the same. On the contrary, I find that the bondholders and their trustee are entitled to a finding establishing their bonds to the extent that they have proven the same and the rights given them by their trust deed of a lien and priority of payment. A proper order may be entered to this effect.